UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - x
                                        :
UNITED STATES OF AMERICA                :    SEALED INDICTMENT
                                        :
        -v.-                            :    21 Cr.
                                        :
JOHN HANICK,                            :
        a/k/a "Jack Hanick,"
                                             21 CRIM 676
        Defendant.                      :
- - - - - - - - - - - - - - - - - - - - x

## COUNT ONE
### (Violation of the International Emergency Economic Powers Act)

The Grand Jury charges:

### The Defendant

1.   JOHN HANICK, a/k/a "Jack Hanick," the defendant, is a United States citizen. From in or around 1996 through in or around 2011, HANICK worked as a producer for a United States cable television network located in New York, New York. Thereafter, from in or about 2013 through in or about 2017, HANICK worked in support of the efforts of a Russian national who was subjected to economic sanctions as of December 2014, to establish and develop media outlets in Russia, Greece, Bulgaria, and elsewhere.

### The International Emergency Economic Powers Act and the Relevant Sanctions Orders and Regulations

2.   The International Emergency Economic Powers Act ("IEEPA"), codified at Title 50, United States Code, Sections 1701-1708, confers upon the President authority to deal with unusual and extraordinary threats to the national security and foreign

policy of the United States. Section 1705 provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter." 50 U.S.C. § 1705(a).

3. In 2014, pursuant to his authorities under the IEEPA, the President issued Executive Order 13,660, which declared a national emergency with respect to the situation in Ukraine. To address this national emergency, the President blocked all property and interest in property that were then or thereafter came within the United States or the possession or control of any United States person, of individuals determined by the Secretary of the Treasury to meet one or more enumerated criteria. These criteria include, but are not limited to, individuals determined to be responsible for or complicit in, or who engage in, actions or policies that threaten the peace, security, stability, sovereignty, or territorial integrity of Ukraine; or who materially assist, sponsor, or provide financial, material, or technological support for, or goods or services to, individuals or entities engaging in such activities. Executive Order 13,660 prohibits, among other things, the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked, and the receipt of any contribution or provision of funds, goods,

2

or services from any such person.

4.    The national emergency declared in Executive Order 13,660 with respect to the situation in Ukraine has remained in continuous effect since 2014, and was most recently continued on March 2, 2021.

5.    The President twice expanded the scope of the national emergency declared in Executive Order 13,660, through: (1) Executive Order 13,661, issued on March 16, 2014, which addresses the actions and policies of the Russian Federation with respect to Ukraine, including the deployment of Russian Federation military forces in the Crimea region of Ukraine; and (2) Executive Order 13,662, issued on March 20, 2014, which addresses the actions and policies of the Government of the Russian Federation, including its purported annexation of Crimea and its use of force in Ukraine. Executive Orders 13,660, 13,661, and 13,662 are collectively referred to as the "Ukraine-Related Executive Orders."

6.    The Ukraine-Related Executive Orders authorized the Secretary of the Treasury to take such actions, including the promulgation of rules and regulations, and to employ all powers granted to the President under the IEEPA, as may be necessary to carry out the purposes of those orders. The Ukraine-Related Executive Orders further authorized the Secretary of the Treasury to redelegate any of these functions to other offices and agencies of the United States Government.

7.      To implement the Ukraine-Related Executive Orders, the Department of the Treasury's Office of Foreign Assets Control ("OFAC") issued certain Ukraine-Related Sanctions Regulations. These regulations incorporate by reference the definition of prohibited transactions set forth in the Ukraine-Related Executive Orders. *See* 31 C.F.R. § 589.201. The regulations also provide that the names of persons designated directly by the Ukraine-Related Executive Orders, or by OFAC pursuant to the Ukraine-Related Executive Orders, whose property and interests are therefore blocked, are published in the Federal Register and incorporated into the Specially Designated Nationals ("SDN") and Blocked Persons List (the "SDN List"), which is published on OFAC's website. *Id.* Note 1.

8.      According to the Ukraine-Related Sanctions Regulations, a person whose property and interest in property is blocked pursuant to the Ukraine-Related Executive Orders is treated as having an interest in all property and interests in property of any entity in which the person owns, directly or indirectly, a 50 percent or greater interest. *See* 31 C.F.R. § 589.406. Accordingly, such an entity is deemed a person whose property and interests in property are blocked, regardless of whether the name of the entity is incorporated into OFAC's SDN List. *Id.*

9.      On or about December 19, 2014, OFAC designated

Konstantin Malofeyev ("Malofeyev") as an SDN pursuant to Executive Order 13,660. In so designating Malofeyev, OFAC explained that Malofeyev was one of the main sources of financing for Russians promoting separatism in Crimea, and was designated as an SDN because he was responsible for or complicit in, or has engaged in, actions or polices that threaten the peace, security, stability, sovereignty, or territorial integrity of Ukraine and has materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of the so-called Donetsk People's Republic.

### The Sanctions Violations

10.   From at least in or about 2013, through at least in or about 2017, JOHN HANICK, a/k/a "Jack Hanick," the defendant, provided funds, goods, and services to and for the benefit of Malofeyev and companies owned and controlled by Malofeyev, and received funds, goods, and services from Malofeyev. HANICK continued to engage in this conduct after OFAC listed Malofeyev as a SDN, in violation of the Ukraine-Related Sanctions Regulations.

HANICK's Work for Malofeyev on the Russian TV Network

11.   In or about February 2013, JOHN HANICK, a/k/a "Jack Hanick," the defendant, traveled from New York, New York, to Moscow, Russia. As HANICK himself recounted in an unpublished "memoir" discovered by investigators through the judicially authorized search of HANICK's email account, HANICK ostensibly

traveled to Russia at this time to speak at a conference, but was informed by an associate of Malofeyev that "the real purpose of the trip" was to "introduce [HANICK] to investors" in a planned television news network in Russia. Between February 2013 and June 2013, HANICK made four further trips to Russia. During these trips, he met with Malofeyev and associates of Malofeyev to discuss Malofeyev's plan to create a new Russian cable television news network (the "Russian TV Network").

12.  At all times relevant to this Indictment, Malofeyev is and has been the Chairman of the Board of Directors of a corporate group, which has a public website that lists the Russian TV Network as one of its projects. The Russian TV Network also has its own website, which, as of the date of this Indictment, lists Malofeyev as the Founder of the Russian TV Network.

13.  Beginning in at least the first half of 2013, JOHN HANICK, a/k/a "Jack Hanick," the defendant, began corresponding with Malofeyev and associates of Malofeyev regarding HANICK's plan to work for Malofeyev on the Russian TV Network. On or about April 27, 2013, HANICK sent Malofeyev an email in which HANICK stated that he "came to Russia to work for you." Shortly thereafter, HANICK and others exchanged email messages containing draft organizational charts for the Russian TV Network that listed Malofeyev at the top of the organizational chart with the title of "Analytical News Director," and listed HANICK as the Managing

6

Director reporting directly to Malofeyev.

14.   In or about July 2013, JOHN HANICK, a/k/a "Jack Hanick," the defendant, moved to Russia. Prior to moving there, HANICK negotiated the terms of his employment directly with Malofeyev, including the salary he would receive, the payment for his housing in Moscow, and his Russian work visa. In or about May 2013, HANICK sent an email to Malofeyev to confirm their agreement on HANICK's salary, a $5,000 monthly housing stipend, and health insurance, so that Malofeyev's attorney could prepare HANICK's "work contract for my visa." An attorney at a Malofeyev-owned investment company subsequently emailed HANICK a draft employment contract between a separate Russian entity and HANICK, that reflected the terms that HANICK had agreed with Malofeyev.

15.   Upon his move to Russia in or around July 2013, JOHN HANICK, a/k/a "Jack Hanick," the defendant, primarily worked for Malofeyev on the project of starting up the Russian TV Network. In his work, HANICK routinely referred to Malofeyev as the "investor" or the "shareholder" in the Russian TV Network, and discussed instructions for the network that HANICK had received from Malofeyev. In or around May 2014, HANICK sent an email in which he stated that "[t]he issue for our investor is how important it is to be on the air in September. There is a worldwide conference in September which he is sponsoring bringing people from all over the world to Moscow." This was a reference to a conference

7

sponsored in September 2014 by a foundation created and funded by Malofeyev. In or about January 2015, HANICK wrote to Malofeyev that the Russian TV Network would "implement your vision" and that HANICK wanted to "emphasize to all that you are not an investor in someone [else's] ideas." HANICK also communicated Malofeyev's instructions to other employees at the Russian TV Network. In or about July 2014, HANICK wrote to others that "[o]ur investor expects to see many stories on our youtube channel by August 1."

16.    On or about December 19, 2014, OFAC designated Malofeyev as an SDN. Nonetheless, JOHN HANICK, a/k/a "Jack Hanick," the defendant, continued to work for Malofeyev on the Russian TV Network and reported directly to Malofeyev. In or about January 2015, HANICK sent Malofeyev a draft of a "[Russian TV Network] Board News Policy." HANICK wrote that the policy was meant "to implement your vision and to provide you with information for you to make decisions . . . You are the founder and chief architect of the project. We, as board members have the responsibility to direct the staff to implement your instructions." Later in or about January 2015, HANICK sent an email to Malofeyev regarding the "Funding of [the Russian TV Network]," in which HANICK noted that "there is 0 money on our account" and "You said when we had a problem to contact you directly."

17.    The Russian TV Network went on the air in Russia in or about April 2015. JOHN HANICK, a/k/a "Jack Hanick," the

defendant, played a leadership role at the network. In emails spanning from 2015 through 2017, HANICK was at different times described as "Board Chairman, [Russian TV Network]," "General Producer" of the Russian TV Network, "chairman of the HR committee" for the Russian TV Network, and "General Advisor" to the Russian TV Network. HANICK also sent Malofeyev regular emails containing HANICK's analysis of the network's television ratings.

18. JOHN HANICK, a/k/a "Jack Hanick," the defendant, was generally responsible for the technical and operational aspects of the Russian TV Network, pursuant to a plan developed with Malofeyev. For example, in or about August 2016, HANICK wrote an email to another Russian TV Network employee in which HANICK wrote: "When we were with Konstantin, we agreed that we would discuss editorial function of new studio and only then create the technical task. . . . [another Russian TV Network employee] does editorial content without our interference, you do administrative and financial without interference, and I do production and operations."

19. JOHN HANICK, a/k/a "Jack Hanick," the defendant, was paid for his work for the Russian TV Network through two Russian entities. From in or about 2013 through in or about February 2016, HANICK was paid by a Russian entity ("Russian Entity-1"). From in or about May 2016 through 2018, HANICK was paid by another Russian entity ("Russian Entity-2"). This

compensation was overseen by Malofeyev, however. In 2013, HANICK negotiated his salary directly with Malofeyev, and an attorney employed by Malofeyev sent Hanick the draft employment contract with Russian Entity-1. Later, when his pay was coming from Russian Entity-2, HANICK continued to report to Malofeyev. In or about May 2018, HANICK sent an email to Malofeyev, writing "At the end of May, I'll be finished with [Russian Entity-2]. This means that my visa to stay in Russia will end. We need help to stay. Can [Russian Entity-2] extended my employment without pay? My visa with them is through next April? Can you help? I'm sure the solution is simple." HANICK was paid in Russia for his work for Malofeyev and held the payments in a Russian bank account. However, HANICK returned some of these funds to the United States. In or about March 2017, HANICK wired a portion of the payments he had received from Russian Entity-2 from his Russian bank account to a bank account he held at a bank located in New York, New York.

<u>HANICK's Work For Malofeyev on the Greek TV Network</u>

20. While working for Malofeyev on the Russian TV Network, JOHN HANICK, a/k/a "Jack Hanick," the defendant, also worked for Malofeyev on a project to establish and run a Greek television network (the "Greek TV Network") as a joint venture between Malofeyev and a Greek associate of Malofeyev (the "Greek Business Partner"). According to HANICK's unpublished memoir,

Malofeyev introduced HANICK to the Greek Business Partner at a social event hosted by Malofeyev in Moscow.

21.  In or about November or December 2014, JOHN HANICK, a/k/a "Jack Hanick," the defendant, began traveling from Moscow to Greece to meet with the Greek Business Partner and explore the idea of building a Greek television network that would partner with the Russian TV Network. Malofeyev's personal assistants arranged and booked HANICK's travel to and from Greece, and HANICK reported on his trips directly to Malofeyev. In or about December 2014, HANICK sent an email to Malofeyev and the Greek Business Partner to report on a visit that HANICK and the Greek Business Partner had made to a local television station in Greece, which HANICK referred to as "the station which we will own."

22.  In or about May 2015, JOHN HANICK, a/k/a "Jack Hanick," the defendant, relocated from Moscow to Greece to work primarily on the Greek TV Network, while continuing to work for the Russian TV Network as well. Shortly before the move, the Greek Business Partner wrote an email to HANICK stating that "Both K. and I want you in Greece."

23.  JOHN HANICK, a/k/a "Jack Hanick," the defendant, primarily resided in Greece from in or about May 2015 through in or about February 2016. During that time, HANICK reported regularly to Malofeyev on his work on the Russian TV Network and the Greek TV Network, and routinely emphasized the corporate synergy between

the two networks. In or about November 2015, HANICK wrote to Malofeyev that the Greek TV Network was an "opportunity to detail Russia's point of view on Greek TV," and emphasized "our vision of cooperation." Also in or about November 2015, HANICK wrote to Malofeyev that "In order to facilitate the synergy between media holdings, [the Russian TV Network] and [the Greek TV Network] shall provide all resources possible to help each other achieve their goals." In or about December 2015, in response to an inquiry about the Greek TV Network from a representative of Malofeyev, HANICK wrote that "The news about Russia is reported from a Russian reporter from the Russian point of view."

<u>HANICK's Work for Malofeyev on the Bulgarian TV Network</u>

24.  Beginning in or about January 2015, JOHN HANICK, a/k/a "Jack Hanick," the defendant, began assisting Malofeyev in Malofeyev's efforts to acquire a Bulgarian television network (the "Bulgarian TV Network"). Publicly, the Greek Business Partner claimed to be the person who was attempting to acquire the Bulgarian TV Network, but HANICK was privately working on Malofeyev's behalf to acquire the network.

25.  In or about January 2015, JOHN HANICK, a/k/a "Jack Hanick," the defendant, wrote in an email that Malofeyev had "asked me to go to Bulgaria to see the station, evaluate the equipment, and personnel." The following day, HANICK sent an email to an employee of Malofeyev's investment company to ask if they had

contacted the prospective business partner in Bulgaria (the "Bulgarian Business Partner"). HANICK explained that "I must see the station before [the Bulgarian Business Partner's] visit to Moscow on Tuesday. . . . Konstantin needs this information from me."

26. After visiting the Bulgarian TV Network station in Bulgaria on or about February 5, 2015, JOHN HANICK, a/k/a "Jack Hanick," the defendant, wrote a report of his visit to Malofeyev, including HANICK's recommendation that the Russian TV Network begin producing Russian language programming to be broadcast on the Bulgarian TV Network. On or about February 16, 2015, HANICK wrote to the Greek Business Partner, explaining that HANICK was with Malofeyev, who wanted HANICK to travel to Bulgaria the next day "to deal with bank to buy Bulgaria tv and restructure loan." HANICK went on to explain that the Greek Business Partner should send someone to travel with HANICK to help to conceal Malofeyev's role in the acquisition: "He asked me to ask you if someone from your company could come with me to talk to the bank since we understand you cannot go. The buyer should not be Russian but Greek. . . . Please call me or Konstantin directly."

27. In or about April 2015, JOHN HANICK, a/k/a "Jack Hanick," the defendant, wrote an email to update Malofeyev on the Bulgarian TV Network negotiations, outlining the structure of the proposed deal. Malofeyev responded "No. It is wrong. I told you

the correct way to follow in my office." Hanick replied "Thank you, We will proceed as your plan!" About two weeks after this exchange, the Bulgarian police raided the Bulgarian TV Network station to seize equipment on behalf of its creditor bank. The day after the raid, HANICK sent Malofeyev a translation of a Polish-language news article that apparently reported that Malofeyev was rumored to be the true financier of the Bulgarian TV Network deal, despite the Greek Business Partner purportedly being the buyer.

<u>HANICK's False Statements to United States Law Enforcement</u>

28.  On or about February 2, 2021, JOHN HANICK, a/k/a "Jack Hanick," the defendant, was interviewed by Special Agents from the Federal Bureau of Investigation. During this interview, the interviewing agents informed HANICK that they were conducting the interview in connection with a criminal investigation and that they worked in the FBI Field Office in New York, New York. During the interview, HANICK acknowledged that he had learned that Malofeyev was subject to United States sanctions within several months of when they were announced in December 2014, and that he knew that United States persons were not permitted to do business with persons who were sanctioned. HANICK also falsely stated, in substance and in part, that Malofeyev had no involvement in HANICK's travel to Bulgaria in connection with the Bulgarian TV Network deal, and that HANICK did not know that Malofeyev had any connection to the Bulgarian TV Network until reading about it

afterward in the press.

## Statutory Allegations

29.     From at least in or about 2015 through in or about 2018, in the Southern District of New York and elsewhere, JOHN HANICK, a/k/a "Jack Hanick," the defendant, who was a United States person, unlawfully, willfully, and knowingly violated the IEEPA, and the regulations promulgated thereunder, as described above, to wit, HANICK willfully and knowingly provided and caused others to provide funds, goods, and services to and for the benefit of Konstantin Malofeyev, whom OFAC had listed as a Specially Designated National, and companies owned and controlled by Malofeyev, and received funds, goods, and services from Malofeyev, without first obtaining the required approval of OFAC, and evaded and avoided the requirements of United States law with respect to the provision of funds, goods, and services to and for the benefit of Malofeyev, in violation of Executive Orders 13,660, 13,661, and 13,662, and 31 C.F.R. § 589.201.

(Title 50, United States Code, Section 1705; Executive Orders 13,660, 13,661, and 13,662, and Title 31, Code of Federal Regulations § 589.201)

## COUNT TWO

### (False Statements)

The Grand Jury further charges:

30.    The allegations set forth above in Paragraphs 1 through 30 are realleged and incorporated by reference as if set

15

fully forth herein.

31. On or about February 2, 2021, in the Southern District of New York and elsewhere, JOHN HANICK, a/k/a "Jack Hanick," the defendant, in a matter within the jurisdiction of the executive branch of the Government of the United States, did knowingly and willfully make materially false, fictitious, and fraudulent statements and representations, to wit, when interviewed by Special Agents from the Federal Bureau of Investigation, HANICK falsely stated that Konstantin Malofeyev had no involvement in HANICK's travel to Bulgaria in connection with the Bulgarian TV Network deal, and that HANICK did not know that Malofeyev had any connection to the Bulgarian TV Network until reading about it afterward in the press coverage, when in truth, and in fact, and as HANICK well knew, Malofeyev was among the individuals involved in attempting to acquire the Bulgarian TV Network, and was among the individuals with whom HANICK conferred and from whom HANICK received instructions regarding that attempted purchase for the purpose of expanding Malofeyev's media network.

(Title 18, United States Code, Section 1001.)

### FORFEITURE ALLEGATION

32. As a result of committing the offense alleged in Count One this Indictment, JOHN HANICK, a/k/a "Jack Hanick," the defendant, shall forfeit to the United States, pursuant to

Title 18, United States Code, Section 981(a)(1)(C), and Title 28,
United States Code, Section 2461, all property, real and personal,
which constitutes or is derived from proceeds traceable to the
commission of the offense alleged in Count One, including but not
limited to a sum of money in United States currency representing
the amount of proceeds traceable to the commission of said offense.

### Substitute Asset Provision

33.   If any of the property described above as being
subject to forfeiture, as a result of any act or omission of JOHN
HANICK, a/k/a "Jack Hanick," the defendant,

a.    cannot be located upon the exercise of due
diligence;

b.    has been transferred or sold to, or
deposited with, a third party;

c.    has been placed beyond the jurisdiction of
the court;

d.    has been substantially diminished in value;
or

e.    has been commingled with other property
which cannot be divided without difficulty;
it is the intent of the United States, pursuant to Title 21, United
States Code, Section 853(p); and Title 28, United States Code,
Section 2461 to seek

forfeiture of any other property of the defendants up to the value

of the forfeitable property described above.

(Title 18, United States Code, Sections 981;
Title 21, United States Code, Section 853;
Title 28, United States Code, Section 2461.)

_____
FOREPERSON

_____
DAMIAN WILLIAMS
United States Attorney

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

JOHN HANICK,
a/k/a "Jack Hanick,"

Defendant.

### SEALED INDICTMENT

21 Cr. \_\_\_

(50 U.S.C. § 1705; Executive Orders 13,660, 13,661, and 13,662;
31 C.F.R. § 589.201; 18 U.S.C. § 1001)

DAMIAN WILLIAMS
United States Attorney.

_Foreperson._